**SPRANKLE, Appellant,**

v.

**SPRANKLE, Appellee.**

[Cite as *Sprankle v. Sprankle* (1993), 87 Ohio App.3d 129.]

Court of Appeals of Ohio,
Medina County.

No. 2140.

Decided April 7, 1993.

130

*Arthur Axner,* for appellant.

*James R. McIlvaine,* for appellee.

DICKINSON, Judge.

This is an appeal from a decision of the Medina County Court of Common Pleas in a domestic relations matter. Defendant (appellee), John W. Sprankle, is a teacher who participates in the State Teachers Retirement System ("STRS") and who has accumulated certain vested retirement benefits within that system. As part of the property settlement between the parties, the trial court directed that, once defendant begins to draw a pension from STRS, he shall pay plaintiff (appellant), Verniece Sprankle, $708.42 per month. Plaintiff has appealed and has assigned one error. Specifically, plaintiff has asserted that the trial court erred by failing to assign a present value to the vested STRS retirement benefits and in failing to use that present value in determining how the parties' property would be divided. She has also argued that the trial court incorrectly calculated the amount of the monthly payments that defendant will be entitled to when he retires based upon his earnings during the period the parties were married. This court, having reviewed the record before the trial court, overrules plaintiff's assignment of error and affirms the decision of the court of common pleas.

## I. FACTUAL BACKGROUND

The parties in this case were married to each other for twenty-three years. They are the parents of three daughters, whose ages, at the time of the hearing below, were fifteen, thirteen, and eleven. During their marriage, Mr. Sprankle earned bachelor's and master's degrees in the field of education. At the

time of the hearing below, he had been a teacher with the Wadsworth City Schools for twenty years. Mrs. Sprankle had a high school education. She worked for approximately the first nine years of the marriage as a "frame-man" for GTE. In 1976, upon the birth of their first daughter, the parties agreed that Mrs. Sprankle would stay at home. During 1987, Mrs. Sprankle became licensed to sell real estate and worked for a period in that field, but never sold any property. At the time of the hearing below, she was working at a McDonald's restaurant and was enrolled at the University of Akron, pursuing a four-year degree in elementary education.

The evidence before the court below showed that the parties owned the following marital property: household and personal goods; a 1986 Dodge conversion van which at the time of hearing was free of debt; a 1990 Toyota Celica which was encumbered to the full extent of its value; the marital home, which had a fair market value of $114,840 and in which the parties' equity was $63,398; stock from the Shelby Insurance Company; residuals from First American National Securities in connection with insurance policies sold by Mr. Sprankle during a period when he sold insurance; an American Capital 403(B) account; a GTE pension in Mrs. Sprankle's name; and an STRS pension in Mr. Sprankle's name.

The trial court found that it would be in the best interest of the three daughters to be with Mr. Sprankle. Accordingly, he was designated the residential parent and legal custodian of the children. The court further directed that, in order that the children could continue to live in the marital home, Mr. Sprankle would have the option of purchasing Mrs. Sprankle's interest in the real estate for the sum of $31,699 minus certain expenses that would be involved in the buyout. Most of the remaining property was divided equally. In regard to the two pension plans, the court held as follows:

"Each party has a vested pension. Plaintiff has a pension with GTE that will pay her $77.18 per month at age 65. Defendant has a pension with the State Teachers Retirement System that will pay him $1,483.65 per month based upon present contribution and earning. After offsetting the GTE pension, including 89.16% attributable to marriage, the defendant shall pay to the plaintiff the sum of $708.42 per month from his State Teachers Retirement System payments once he begins to draw his pension. This payment will continue for so long as defendant receives payments or plaintiff's death, whichever event occurs first."

Inasmuch as STRS is not covered by the Employee Retirement Income Security Act of 1974 ("ERISA"), codified primarily at Sections 1101 et seq., Title 29, U.S.Code, and has refused to recognize qualified domestic relations orders under that Act, the court stated that if, in the future, STRS becomes subject to ERISA, or consents to the use of such orders, one will be entered. The court

further provided that it would retain jurisdiction to carry out the provisions of its judgment entry related to the STRS pension. It did not make a finding regarding the then present value of the STRS pension.

## II.  DISCUSSION

Retirement benefits earned during a marriage are marital assets and a factor to be considered in the division of property. *Hoyt v. Hoyt* (1990), 53 Ohio St.3d 177, 178, 559 N.E.2d 1292, 1294. A trial court has broad discretion when considering retirement benefits; flexibility is necessary for the court to make an equitable decision based upon factors relevant to the situation before it:

"[W]hen considering a fair and equitable distribution of pension or retirement benefits in a divorce, the trial court must apply its discretion based upon the circumstances of the case, the status of the parties, the nature, terms and conditions of the pension or retirement plan, and the reasonableness of the result; the trial court should attempt to preserve the pension or retirement asset in order that each party can procure the most benefit, and should attempt to disentangle the parties' economic partnership so as to create a conclusion and finality to their marriage." *Id.* at 179, 559 N.E.2d at 1295.

This court has previously recognized that there are at least four different methods by which retirement benefits can be distributed as part of a property settlement:

"The trial court may order (1) withdrawing the employee's interest from the fund; (2) offsetting the present value of the nonemployee spouse's share of the pension with other marital property; (3) offsetting the present value of the nonemployee's share with installment payments; or (4) ordering that a percentage of the future benefits be paid directly from the pension fund to the nonemployee spouse, if and when the pension matures." *Smith v. Smith* (Feb. 15, 1989), Summit App.No. 13678, unreported, at 4, 1989 WL 11803.

In *Hoyt v. Hoyt, supra*, 53 Ohio St.3d at 182, 559 N.E.2d at 1297, the Supreme Court stated that there are certain advantages to finding a present cash value to a pension fund and immediately distributing it through one of the first three methods set forth above:

"The advantage of determining a present cash value is that it disentangles the affairs of the parties and concludes their economic partnership. Once the trial court has determined a value, a sum certain, the fund may be liquidated or the employed spouse could be required to make periodic payments to the nonemployed spouse in an amount equivalent to that person's share. Another alternative would be to offset the unemployed spouse's proportionate share with some other marital asset."

The Supreme Court also recognized, however, that it might not be possible to completely disentangle the parties in every case. "This alternative may be viable only when the parties have other substantial marital assets to offset the nonemployed spouse's share." *Id.*

In this case, the only substantial marital asset the parties had, other than the STRS fund, was the marital home. The trial court found that it would be best for the three children if Mr. Sprankle, with whom they would be living, were given an opportunity to buy out Mrs. Sprankle's interest in the home. Clearly, in light of the trial court's conclusion in that regard, it would not have been in the best interest of the children to require Mr. Sprankle to liquidate his interest in the home in order to make a payment to Mrs. Sprankle equal to her share in the cash value of the STRS fund. Further, in light of the financial commitment necessary on Mr. Sprankle's part to purchase Mrs. Sprankle's share of the house, and the trial court's determination that it would be inappropriate to order Mrs. Sprankle to pay any child support, the trial court did not abuse its discretion in not directing Mr. Sprankle to liquidate Mrs. Sprankle's interest in the STRS fund through periodic payments. Finally, liquidation of the STRS fund to allow its immediate division, if possible, would greatly reduce its value. As noted by the Supreme Court in *Hoyt*, "the trial court must obtain a result which will preserve the asset so that each party can procure the most benefit." *Id.* at 181, 559 N.E.2d at 1297.

Based upon the foregoing, the fourth alternative recognized by this court in *Smith*, "ordering that a percentage of the future benefits be paid directly from the pension fund to the nonemployee spouse, if and when the pension matures," would appear most appropriate for this case. *Smith* at 4, 1989 WL 11803. There is, however, a problem with applying the fourth alternative in this case.

As noted previously, STRS is not covered by ERISA and has refused to recognize qualified domestic relations orders. The Ohio Supreme Court explained the nature and function of a qualified domestic relations order ("QDRO") in *Hoyt v. Hoyt, supra,* 53 Ohio St.3d at 179–180, 559 N.E.2d at 1295–1296:

"A QDRO is a qualified domestic relations order 'which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan * * *.' Employee Retirement Income Security Act of 1974 ('ERISA'), Section 206(d)(3)(B)(i)(I) and Section 414(p)(1)(A)(i), Title 26, U.S. Code. Under the Retirement Equity Act of 1984 ('REA'), the QDRO allows the transfer of retirement benefits to an alternate payee (generally the former spouse) without triggering the anti-assignment or alienation provision of a retirement plan."

When, as part of a property settlement, a qualified domestic relations order is used to divide a retirement fund, the economic partnership of the parties remains more entangled than if a more immediate distribution is ordered. It is, however, a good compromise when a more immediate distribution is not viable, because, once the qualified domestic relations order is in place, the nonparticipant spouse can look directly to the pension fund for benefits rather than having to look to the participant spouse.

When, as in this case, the retirement fund involved is one that does not recognize qualified domestic relations orders, the degree of disentanglement possible with such an order is not available. Mrs. Sprankle appears to argue that, in this type of case, only the first three methods of division recognized by this court in *Smith* are available to a trial court because of the language used by this court in *Smith* to describe the fourth alternative. That is, inasmuch as it is not possible to order pension funds to be paid "directly from the pension fund to the nonemployee spouse" without a qualified domestic relations order, when dealing with a plan that refuses to recognize such orders, the trial court must divide the fund using one of the other three methods listed in *Smith* even though use of one of those alternatives is not "viable." It would not be appropriate, however, to so limit the discretion of the trial court.

When an immediate division is not viable and a qualified domestic relations order can be used, it is better to do so. When an immediate division is not viable and a qualified domestic relations order cannot be used, the method used by the trial court in this case is acceptable. The plan at issue in *Smith* was one covered by ERISA and, accordingly, to the extent this court's decision in that case appeared to provide that divisions of pension funds at the time of payout may only be accomplished by use of a qualified domestic relations order, that statement is properly viewed as limited to cases involving funds covered by ERISA or which voluntarily recognize qualified domestic relations orders. The method used by the trial court in this case was appropriate based upon the facts of this case.

■ Mrs. Sprankle has also argued that the trial court erred in not determining a present value for the STRS fund at the time of the hearing. In *Smith*, this court noted that when a qualified domestic relations order is used to divide a pension fund, "the present value of the fund becomes less important." *Id.* at 4–5, 1989 WL 11803. The same is true any time a division is made that becomes effective at retirement instead of immediately. No purpose would have been served in this case in determining a present value for the pension fund. A present value must be determined if that value is going to be immediately divided through liquidation of the fund, by being offset against other marital assets, or through periodic payments by one spouse to the other. When, as in this case, the

division is not going to occur until benefits are paid, it is the projected amount of those payments that is critical, not the value at the time of the hearing.

■ Finally, Mrs. Sprankle has argued that the referee, whose recommendation regarding the amount of the payments that should be made to Mrs. Sprankle by Mr. Sprankle at the time he retires was adopted by the trial court, erred in determining the payments that will be due Mr. Sprankle when he retires, based upon his employment during the period of parties' marriage. The referee found that he will receive $17,803.80 annually based upon his earnings during the marriage. Mrs. Sprankle has asserted that the actual amount of those annual payments will be $44,000. She has explained the cause of this discrepancy in her brief to this court as follows:

"The testimony of appellee's expert witness was that the utilization of the money purchase plan was a necessary step in evaluating a State Teachers Retirement System pension. Further, that there are two alternative types of benefit calculations for service retirement: (1) the salary related formula benefit, or (2) the money purchase benefit. By law, the participant is eligible for the greater of the two amounts and for most members, the salary related formula benefit which is related to current salaries results in a larger pension benefit.

"Regrettably, the trial court unilaterally decided to use the 2.1% formula; the utilization of this formula is clearly a mistake and represents the basis for the under evaluation of the pension estimate."

It is true that Mrs. Sprankle's expert testified that there were two possible ways to calculate the amount to which Mr. Sprankle would be entitled at the time of his retirement based upon his earnings during the marriage:

"The one that everyone knows is the 2.1 Percent Formula, which is 2.1 percent times the number of years times the high three-year salary average.

"The other one, not as widely known, is the Money Purchase Formula. Here a calculation is made for the value of the employee's and the employer's contributions, and then you divide that by an STRS actuarial figure to give the retirement income."

The expert then testified that he had calculated Mr. Sprankle's yearly benefits using the money purchase formula to be $44,882.43. He next explained how he used that amount to determine a present value for the pension. He failed, however, to explain how the money purchase formula is actually applied or how he specifically calculated the $44,882.43 in this case. Plaintiff's Exhibit 1, the expert's report to Mrs. Sprankle's attorney, contained a worksheet captioned "STRS Money Purchase Computations" that purportedly demonstrated calculations that resulted in a "Yearly Retirement Salary" of $44,882.43, but neither the worksheet nor the report itself contained an explanation of those calculations.

On cross-examination the expert reiterated: "What I did was applied the STRS formula for doing money purchasing exactly, and that's what their figure would be." Finally, the expert testified as follows in response to questioning by the referee regarding why the monthly retirement benefit calculated by the expert, $3,740.20, was different from a projected retirement payment per month shown on Defendant's Exhibit L, an annual statement of account provided to Mr. Sprankle by STRS for the year ended June 30, 1990:

"Okay. What they do, and it's in the general plan summary of STRS, they use what's known as a crystal-ball figure at this time, and it's not to be relied upon.

"That is generated—what it does is, they do a guesstimate at this time, normally based on the 2.1 Percent Formula. It's easier for them to compute—to generate this figure at this time. Actually, there's a lot more number crunching.

"So when they write a letter to STRS and ask what if Mr. Sprankle retires today, what would he retire at, they run the 2.1 formula on that salary of $54,400. Money Purchase is far more difficult to run. As you can see, it's not a lot of fun, it takes a while to look at all of the factors involved in it. So what happens, they do this crystal-ball based on 2.1 Percent.

"THE COURT: However, when the teacher actually retires, they take the highest figure of the two formulas.

"THE WITNESS: That's correct. * * *"

The referee rejected Mrs. Sprankle's expert's opinion of the present value of Mr. Sprankle's pension because of the lack of a foundation for his annual figure of $44,882.43. Having reviewed the expert's testimony regarding that number, we agree with the referee's statements that the expert "did not adequately explain how he arrived at that number." He stated that it was "difficult to run," involved a lot of "factors," and that he had done it correctly, but he failed to adequately explain what he did and how he did it. Accordingly, the trial court did not abuse its discretion in refusing to accept his calculation.

Having rejected Mrs. Sprankle's expert's calculation, the referee applied the 2.1 percent formula herself and calculated an annual retirement benefit for Mr. Sprankle of $17,803.80, which she then divided by twelve to arrive at a projected monthly benefit of $1,483.65. From that amount she subtracted the marital property part of Mrs. Sprankle's projected monthly GTE pension ($66.81), leaving $1,416.84, which she then divided by two and arrived at $708.42, the amount that she recommended Mr. Sprankle be required to pay Mrs. Sprankle per month when he retires. As noted previously, the trial court adopted the referee's recommendation in this regard. Mrs. Sprankle has not suggested that the referee's calculation of the benefit payable pursuant to the 2.1 percent

formula was not done correctly. Accordingly, we find that the trial court did not abuse its discretion in adopting the referee's recommendation.

## III.   CONCLUSION

Based on the foregoing discussion, Mrs. Sprankle's assignment of error is overruled. Accordingly, the decision of the trial court is affirmed.

*Judgment affirmed.*

COOK, P.J., and BAIRD, J., concur.