DAVIS, Appellee,

v.

DAVIS; Police & Fireman's Disability & Pension Fund, Appellant.

[Cite as *Davis v. Davis* (1998), 131 Ohio App.3d 686.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 17124.

Decided Dec. 4, 1998.

*Christopher Bennington,* for appellee.

*Betty D. Montgomery,* Attorney General, and *Harold F. Craig III,* Assistant Attorney General, for appellant.

FREDERICK N. YOUNG, Presiding Judge.

The Police and Fireman's Disability and Pension Fund (the "Fund" or "PFDPF") appeals from an order of the domestic relations court that overruled the Fund's motion to vacate a Qualified Domestic Relations Order ("QDRO") that the court had previously issued against the Fund. For the reasons that follow, the order of the domestic relations court will be reversed.

This matter originated with the filing of a complaint for divorce by Jeanette Davis against her then-husband, James Davis. On July 25, 1995, the court issued

a Final Judgment and Decree of Divorce, which included a division of the parties' marital property. Paragraph VIII(D) of the divorce decree states:

"D. Retirement

"Husband is a participant in Ohio Police and Fire Fighters Retirement Plan. Wife shall be entitled to one-half of the benefits of said plan accrued to Husband during the parties' marriage pursuant to a Qualified Domestic Relations Order."

As contemplated by the divorce decree, a QDRO was subsequently issued by the court on October 23, 1997. Paragraph 1 of the QDRO states:

"1. Effect of This Order as a Qualified Domestic Relations Order: This Order creates and recognizes the existence of an Alternate Payee's right to receive a portion of the Participant's benefits payable under the Police and Firemen's Disability and Pension Fund. It is intended to constitute a Qualified Domestic Relations Order ('QDRO') as such term is currently defined under Section 414(p) of the Internal Revenue Code, and to satisfy the Plan's requirements for the assignment of benefits to an Alternate Payee. When Qualified Domestic Relations Orders, or other court ordered decrees of a similar fashion, become acceptable to the administrator of the Police and Firemen's Disability and Pension Fund as a means of assigning all or a portion of a Participant's benefits to an Alternate Payee, then the benefits as stipulated under the terms of this Attachment A shall become payable to the Alternate Payee designated in Section 3 below. Further, the terms and provisions of this Order shall be modified to the extent necessary to conform with the provisions of assignment as adopted by the Police and Firemen's Disability and Pension Fund."

The QDRO identified Mr. Davis as the plan "participant" and designated Mrs. Davis as the "Alternate Payee" under the plan. In addition, the QDRO assigned to Mrs. Davis "an amount equal to Fifty Percent (50%) of the Marital Portion of the Participant's Accrued Benefit under the Plan as of the Participant's benefit commencement date" and provided a formula for calculating that amount. Further, the QDRO provided that Mrs. Davis "shall be eligible to commence her share of the benefits" when her husband retires, that she "may elect to receive her benefits in any one of the allowable benefit options under the Plan," and that "if permitted by the Plan, the Alternate Payee [Mrs. Davis] shall receive her share of the benefits based on her own life expectancy utilizing the Plan's standard actuarial assumptions." Finally, the QDRO stated that it was not intended to require the Plan to provide any type of benefit option not otherwise provided under the Plan's terms or to require the Plan to provide increased benefits determined on the basis of actuarial value.

Mr. and Mrs. Davis both approved the issuance of the QDRO. However, on November 20, 1997, the Fund filed a motion asking the court to vacate the

QDRO.[1] The Fund argued that the QDRO conflicted with R.C. 742.47, which precludes attachment or seizure of money due or potentially due to members of the Fund. In addition, the Fund argued that as a governmental pension plan, it was exempt from the provisions of the Employee Retirement Income Security Act ("ERISA"), Section 1001 *et seq.*, Title 29, U.S.Code, which specifically authorizes the use of QDROs.

The court overruled the Fund's motion to vacate. The court concluded that to the extent the money in a Fund member's retirement account constituted marital property, the Fund member's spouse had an equitable ownership interest in that money and was not merely a creditor of the Fund member. The court further concluded that R.C. 742.47 precluded only the Fund from making payments to a Fund member's creditors, and accordingly, did not prevent the Fund from distributing benefits directly to the Fund member's spouse pursuant to a QDRO. The court also rejected the Fund's ERISA argument, concluding that ERISA did not prohibit the court from dividing the parties' ownership interest in the pension fund.

In addition to overruling the Fund's motion to vacate, the court further stated:

"This court finds that it is equitable to divide that portion of the Davis' marital estate which is comprised of the PFDPF benefits acquired during the marriage, in the same manner upon which the parties themselves agreed; namely by the division of that fund equally between the parties by a qualified domestic relations order. This order shall segregate each party's interest into a fund titled to and controlled solely by that party; provided however, that the order shall not require PFDPF to provide any type of benefit option not otherwise provided under the terms of the fund, nor require increased benefits determined on the basis of actuarial value, nor require any distributions prior to the benefits becoming mature under the existing terms of the fund."

The Fund filed a timely notice of appeal. In its brief, the Fund provides an "Issue Presented for Review," which we will treat as its sole assignment of error:

"The trial court abused its discretion by ordering the Police and Firemen's Disability and Pension Fund to segregate Mr. Davis's pension account by issuance of a Qualified Domestic Relations Order."

It is perhaps somewhat puzzling as to why the Fund would seek an order vacating the QDRO issued by the court. As noted above, the order states that "[w]hen Qualified Domestic Relations Orders * * * become acceptable to the administrator of the Police and Firemen's Disability and Pension Fund as a

---

1. In the record transmitted to us, it does not appear that the Fund was ever expressly made a party to the action. However, by entertaining the Fund's motion to vacate, the trial court implicitly permitted the Fund to join, or intervene, in the action after judgment.

means of assigning all or a portion of a Participant's benefits to an Alternate Payee, then the benefits as stipulated under the terms of this Attachment A shall become payable to the Alternate Payee." To that extent, the QDRO is arguably only provisional in nature and of no real effect.

On the other hand, the QDRO also states initially that it "creates and recognizes the existence of an Alternate Payee's right to receive a portion of the Participant's benefits payable under the Police and Firemen's Disability and Pension Fund." To that extent, the QDRO arguably operates as a present division of the money otherwise allocated to Mr. Davis's account, with actual payment of those benefits to be made in the future. Moreover, this language that "creates and recognizes" Mrs. Davis's right appears before any of the provisional-type language contained in the QDRO. Thus, in seeking to vacate the QDRO, the Fund was presumably concerned with the right created and recognized by that order and how to administratively handle that right.

It is also apparent from the record that the trial court did not view its QDRO as being only provisional in nature. In its "Entry Overruling Motion of PFDPF to Vacate QDRO," the court stated that the "QDRO *allocated* to the plaintiff (designated therein as 'Alternate Payee') a portion of the PFDPF benefits due in the future to defendant (designated therein as 'the plan Participant')." (Emphasis added.) The court also stated that the QDRO "require[d] PFDPF to recognize each party's one-half interest in the PFDPF benefits accumulated during the marriage." The court also commented on the Fund's "refusal to recognize and obey a lawful order *dividing* pension benefits between ex-spouses." (Emphasis added.) Similar descriptions of the effect of the QDRO appear throughout the court's decision.

Thus, as confirmed by the court, the QDRO had the effect of creating a present division and allocation of the funds credited to Mr. Davis's pension account. Lest there be any doubt that the QDRO imposed present requirements on the Fund and was not just provisional in nature, in its "Entry Overruling Motion of PFDPF to Vacate QDRO," the court ordered the Fund to "segregate each party's interest into a fund titled to and controlled solely by that party." Whether this is viewed as an additional requirement or an amplification of the effect of the previously issued QDRO, it seems clear that the QDRO issued by the court was more than just a provisional order that the Fund was free to ignore. With that understanding in mind, we will proceed to review the merits of the Fund's appeal.

 It is well settled that "[p]ension or retirement benefits accumulated during the course of a marriage are marital assets subject to property division in a divorce action." *Erb v. Erb* (1996), 75 Ohio St.3d 18, 20, 661 N.E.2d 175, 178. Further, "[w]hen distributing these marital assets, a trial court must apply its discretion based upon the circumstances of the case, the status of the parties, the

nature, terms and conditions of the pension or retirement plan, and the reasonableness of the result." *Id.;* see, also, *Hoyt v. Hoyt* (1990), 53 Ohio St.3d 177, 559 N.E.2d 1292, paragraph one of the syllabus.

■ As recognized by the trial court in its decision, courts have generally adopted one of four methods to divide the marital portion of a retirement pension. Courts may:

1. Require withdrawal of the funds presently accumulated in the pension plan when that is possible;

2. Offset the present value of the non-employee spouse's share with other marital property of the parties;

3. Offset the present value of the non-employee spouse's share by ordering installment payments to be made by the employee spouse; or

4. Order that the non-employee spouse's percentage share of future benefits be paid directly to the non-employee spouse by the pension plan when the pension matures. *Connolly v. Connolly* (1990), 70 Ohio App.3d 738, 743, 591 N.E.2d 1362, 1365, fn. 1; see, also, *Powell v. Powell* (1989), 49 Ohio App.3d 56, 58, 550 N.E.2d 538, 540–541.

In this instance, the trial court chose the fourth method of distributing the marital portion of Mr. Davis's pension. As agreed to by the parties, the court issued a QDRO that effectively required the Fund to make certain payments directly to Mrs. Davis as of the date that Mr. Davis's benefits would commence under his retirement plan. Although the Fund characterizes the court's action as an abuse of its discretion, it is apparent that the real question presented by this appeal is one of law, that is, whether the order issued by the court is one that is permitted by Ohio law. If not, then the court erred in refusing to vacate the QDRO when asked to do so by the Fund.

In *Erb v. Erb, supra,* the Ohio Supreme Court considered "whether a court may order, as part of a marital property award in a divorce action, the Police and Firemen's Disability and Pension Fund of Ohio to pay pension benefits to a non-employee spouse prior to the participant's retirement." *Id.,* 75 Ohio St.3d at 20, 661 N.E.2d at 177. The court noted that " '[a]s a creature of statute, the PFDPF has no authority beyond that which is expressly or impliedly conferred by statute.' " *Id.* at 22, 661 N.E.2d at 179, quoting *Dreger v. Pub. Emp. Retirement Sys.* (1987), 34 Ohio St.3d 17, 20–21, 516 N.E.2d 214, 216–218. The court determined that pursuant to the legislation that created the Fund, R.C. Chapter 742, the Fund was not authorized to pay any retirement benefits to anyone until the participating employee had actually retired. *Erb. v. Erb, supra,* at 22, 661 N.E.2d at 179. Accordingly, the trial court's order that required the Fund to immediately distribute to Mrs. Erb her interest in her husband's retirement fund

before he retired was struck down as violating the terms of the pension plan. The court further concluded that its decision did not deprive Mrs. Erb of her property interest in her husband's pension plan and that " 'any given pension or retirement fund is not necessarily subject to direct division.' " *Id.*, quoting *Hoyt v. Hoyt* (1990), 53 Ohio St.3d 177, 180, 559 N.E.2d 1292, 1296.

We believe that the court's decision in *Erb* is dispositive of the issues presented here. Like the order addressed in *Erb*, the court's order here violates certain provisions of R.C. Chapter 742 and must, therefore, be reversed.

R.C. 742.02 creates "a police and firemen's disability and pension fund for the purpose of providing disability benefits and pensions to members of the fund and their surviving spouses, children, and dependent parents." A "member of the fund" is defined as "any person * * * who is contributing a percentage of the person's annual salary to the police and firemen's disability and pension fund." R.C. 742.01(E). Each "employee" is required to contribute a specified amount of his annual salary to the Fund. R.C. 742.31. "Employee" is defined as "any person who is a member of a police department or a member of a fire department." R.C. 742.01(C). Further, the Fund's board of trustees "shall provide for the maintenance of an individual account with each member of the fund * * * showing the amount of his contributions." R.C. 742.42.

"Members of the fund" who meet certain eligibility requirements are entitled to receive pensions and benefits from the Fund. See R.C. 742.37(C). For example, "[a] member of the fund who has completed twenty-five years of active service in a police or fire department and has attained forty-eight years of age may, at the member's election, retire from the police or fire department, and upon notifying the board in writing of the election, shall receive an annual pension, payable in twelve monthly installments, in an amount equal to a percentage of the member's average annual salary." R.C. 742.37(C)(1). Moreover, pursuant to R.C. 742.3711, "a member of the fund," upon application for retirement, has various payment options to choose from in receiving his or her pension.

■ The QDRO issued by the court established Mrs. Davis as an alternate payee and assigned to her certain retirement benefits otherwise payable to her husband, the Fund member. The QDRO provided Mrs. Davis not only with the right to receive benefits directly, but also with the right to receive them in accord with whatever payment option she chose that was available under the plan. Moreover, in the court's entry overruling the Fund's motion to vacate, the court also made clear that pursuant to the QDRO, each party's interest in Mr. Davis's pension fund was to be segregated into a fund titled to and controlled solely by that party. In short, the court provided Mrs. Davis with rights and benefits that, pursuant to R.C. Chapter 742, are available only to members of the Fund. To

that extent, the court's orders conflicted with the terms and conditions of Mr. Davis's retirement pension plan.

In addition, contrary to the court's conclusion, we also believe that the QDRO violated the terms of R.C. 742.47, which states:

"Except as provided in sections 742.461, 3111.23, and 3113.21 of the Revised Code, sums of money due or to become due to any person from the police and firemen's disability and pension fund are not liable to attachment, garnishment, levy, or seizure under any legal or equitable process, whether such sums remain with the treasurer of the fund or any officer or agent of the board of trustees of the fund, or is in the course of transmission to the person entitled thereto, but shall inure wholly to the benefit of such person."

As noted above, the only persons to whom sums of money can be due from the Fund are those individuals who qualify as "members of the fund." See R.C. 742.37(C); see, also, R.C. 742.01(E). Mr. Davis is a member of the Fund and upon meeting certain eligibility requirements may be entitled to receive certain sums of money from the Fund in the form of retirement pension benefits. Mrs. Davis has an interest in the sums potentially due Mr. Davis to the extent that they constitute marital property. However, because Mrs. Davis is not herself a member of the Fund, she is statutorily precluded from receiving her interest in her husband's benefits *directly from the Fund.*

Moreover, with certain exceptions not applicable here,[2] the sums of money that may become due to Mr. Davis are not subject to "attachment, garnishment, levy, or seizure under any legal or equitable process." R.C. 742.47. The trial court concluded that these provisions applied only to creditors of Mr. Davis and did not preclude a court order that awarded to Mrs. Davis her own interest in her husband's pension funds. Nevertheless, under R.C. Chapter 742, the sums of money representing Mr. Davis's pension benefits are, at least initially, due to him. The court's order transfers a portion of that money directly to Mrs. Davis before Mr. Davis ever receives it. To that extent, the court's order precludes that money from inuring wholly to his benefit, as the statute requires, and effectively operates as an attachment or seizure of money due Mr. Davis. As a result, the court's order violates R.C. 742.47.

We note that other Ohio courts have also concluded that a PFDPF member's retirement benefits may not be distributed directly to a spouse in connection with

---

2. The exceptions referred to in R.C. 742.47 concern theft in office and orders for child support and/or spousal support. The order here concerns a division of marital property, not a support order. The legislature has not provided a similar exception permitting the attachment, garnishment, levy, or seizure of money due a Fund member in order to satisfy a division of marital property.

a marital property award. As stated in *Ricketts v. Ricketts* (1996), 109 Ohio App.3d 746, 673 N.E.2d 156:

"However, public pension funds, such as the Police and Firemen's Disability and Pension Fund, are not subject to attachment, garnishment, levy, or seizure under any legal or equitable process, including QDROs relating to a property division in a divorce action. See, *e.g.*, R.C. 742.47. Thus, a QDRO is not an acceptable method for division of a public pension." *Id.* at 752, 673 N.E.2d at 160; see, also, *Hoover v. Hoover* (Sept. 8, 1995), Portage App. Nos. 93–P–0090 and 93–P–0091, unreported; *Farley v. Farley* (Apr. 6, 1994), Lorain App. No. 93CA005663, unreported, 1994 WL 117119.

In addition, courts have similarly held that other state pension funds are not subject to direct distribution from the fund to the nonmember spouse. See, *e.g.*, *Sprankle v. Sprankle* (1993), 87 Ohio App.3d 129, 621 N.E.2d 1310 (State Teachers Retirement System); *Graham v. Graham* (Sept. 7, 1993), Greene App. No. 92–CA–114, unreported, 1993 WL 350038 (Public Employees Retirement System).

In support of her claim that the trial court was authorized to order the Fund to make direct payments to her upon her husband's retirement, Mrs. Davis cites *In re McCafferty* (C.A.6, 1996), 96 F.3d 192. In *McCafferty*, the court concluded that a divorced husband held his state pension retirement benefits in constructive trust for his former wife to the extent that those benefits represented her interest in that marital asset. Accordingly, the former wife's interest in those benefits did not constitute a part of her ex-husband's bankrupt estate, and his obligation to pay his former spouse her share of those benefits was not a debt dischargeable by him in bankruptcy. That holding does not require a result different from the one we reach here. *McCafferty* simply protects a former spouse from losing her interest in marital property held by her husband in the event that he declares bankruptcy. *McCafferty* does not address, however, the question of whether a state pension fund can be compelled to pay retirement benefits directly to a nonmember of that fund.

In sum, the court's order conflicts with several provisions contained in R.C. Chapter 742 and, accordingly, must be reversed. See *Erb v. Erb, supra,* 75 Ohio St.3d 18, 661 N.E.2d 175.[3] We are not unsympathetic, however, to the concerns expressed by the domestic relations court. As the court cogently stated:

---

**3.** As Mrs. Davis notes in her brief, the *Erb* court specifically did not reach the issue of whether the PFDPF is subject to a QDRO. The *Erb* court concluded that the challenged order did not qualify as a QDRO because it provided for an option not yet available under the terms of the PFDPF. See *Erb v. Erb, supra,* 75 Ohio St.3d at 20, 661 N.E.2d at 177, fn. 1. By similar reasoning, the order imposed here cannot qualify as a QDRO because it too required the plan to provide a type or form of benefit not otherwise available under the plan, despite language

"A fifth option is advocated by movant, and has been adopted as a last resort by other courts which have found their hands tied by the refusal of state pension funds to honor a QDRO. The fifth option is that of allowing a state pension fund member to collect the entire pension at retirement and to pay the correct percentage each month to the ex-spouse. This mechanism for enforcing pension rights is fraught with problems any court would be very reluctant to impose upon divorcing parties: the need for one party to track the location and employment status of the other for years or decades, until retirement and beyond; the incentive for the fund member to physically hide from the ex-spouse; the possibility of fund member dying before the other party's share of the retirement is paid in full; the opportunities for fraudulent misappropriation of the retirement benefits by the fund member; the inability of the non-fund member to make any of his or her own decisions concerning the management of their own pension interests; the possible costs of maintaining enforcement actions against the fund member if voluntary compliance with the court's orders is not forthcoming; and the invitation to further litigation (for example, see *Quadri v. Quadri*, No. 93APF10–1494 [unreported], 1994 WL 461821 [Franklin Cty., August 25, 1994])."

Nevertheless, we are constrained by the statutes as they are currently written. Accordingly, the solution to the concerns expressed by the court must lie in legislative action.

The Fund's sole assignment of error is sustained.

## CONCLUSION

Having sustained the Fund's assignment of error, the court's order denying the Fund's motion to vacate the previously issued QDRO will be reversed. The matter will be remanded to the domestic relations court for further proceedings consistent with this opinion.

*Judgment reversed
and cause remanded.*

BROGAN and FAIN, JJ., concur.

---

contained in the order to the contrary. Accordingly, it is also not necessary for us to reach the issue of whether the PFDPF may ever be subject to a properly drawn QDRO. However, we note that a QDRO is defined as a domestic relations order that creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a pension plan. See Section 414(p)(1)(I), Title 26, U.S.Code; see, also, Section 1056(d)(3)(B)(I), Title 29, U.S.Code. In view of our determination that the PFDPF is not statutorily permitted to pay funds directly to anyone other than a Fund member, it would appear that any QDRO issued against the Fund would necessarily fail.